No. 46,338

CAMPBELL SIXTY-SIX EXPRESS, INC., *Appellant,* v. ADVENTURE LINE MANUFACTURING COMPANY, INC., *Appellee.*

(496 P. 2d 1351)

Opinion filed May 6, 1972.

*Nelson E. Toburen,* of Keller, Wilbert, Palmer & Lassman, of Pittsburg, argued the cause and was on the brief for the appellant.

*Glenn Jones,* of Parsons, argued the cause, and *Richard C. Dearth* and *Jack L. Goodrich,* also of Parsons, were with him on the brief for the appellee.

The opinion of the court was delivered by

OWSLEY, J.: This is an action to recover for loss of a semitrailer by fire. Plaintiff appeals from a jury verdict in favor of the defendant. On December 9, 1968, a fire occurred at the defendant's place of business in Parsons, Kansas. As a result of the fire defendant's place of business was totally destroyed, as well as plaintiff's 1967 Utility Van semitrailer which was parked for loading at the defendant's plant.

The defendant was engaged in manufacturing antipersonnel bombs under contract with the federal government for use by the Kansas Ordnance Plant at Parsons, Kansas. The plaintiff is a common carrier and also had a contract with the federal government to transfer the bombs from defendant's plant to the Kansas Ordnance Plant.

Several amendments were made to the plaintiff's petition as a result of pretrial proceedings, but at the time the case was tried the petition alleged specific acts of negligence in Count I, and alleged facts in support of the doctrine of *res ipsa loquitur* in Count II. The petition also alleged plaintiff was a business invitee on defendant's premises requiring defendant to exercise due care over plaintiff's property. The defendant in his answer denied that plaintiff was an invitee on its premises and alleged that defendant was a gratuitous bailee, which bailment was for the exclusive benefit of the bailor. The answer also alleged that plaintiff was guilty of contributory negligence.

Pursuant to K. S. A. 60-236 (*a*), plaintiff filed a Request for Admissions in the following form:

"Plaintiff, Campbell Sixty-Six, requests defendant, Adventureline within 14 days after service of this request to make the following admissions for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at trial:

"B. That each of the following statements is true.

"1. That on December 9, 1968, a Utility Van Trailer, 1967 Model, Serial No. 6T7 0571 068 VS 2 D was parked at a loading dock at the Adventureline Manufacturing Plant for the purpose of being loaded with merchandise manufactured by defendant and to be described on bills of lading after loading on said trailer as '1325 BLU-26/B Metal Parts Kit Bomb Body Parts Noi NMFC 14080 UFC 6050'

"*a.* for shipment to the Kansas Army Ammunition Plant, Parsons, Kansas;
"*b.* so parked as stated with the permission, consent, and approval of the defendant;
"*c.* so parked as stated at the request of the defendant;

"*d.* pursuant to agreement between the United States Government, Campbell Sixty Six Express, Inc., and Adventureline Manufacturing Company, Inc.

"*e.* that while so parked and before being loaded, said trailer was totally destroyed by fire.

"2. That the fair market value of said Utility Van Trailer, Serial No. 6T7 0571 068 VS 2 D was Five Thousand, Ninety-one and 47/100 ($5,091.47) Dollars on December 9, 1968.

"3. That Frank Leslie Mitchell, was, on December 9, 1968, the operator of die cast machine number six at defendant's plant, and at all times pertinent hereto he was acting within the scope of his employment as an agent, servant and employee of the defendant.

"4. That at the time of said fire on December 9, 1968, said Frank Leslie Mitchell:

"*a.* was spraying a liquid from a spray gun onto die casting machine number six;

"*b.* that said fire started when said liquid went into the pot on die casting machine number six;

"*c.* that said liquid being sprayed contains kerosene and is flammable;

"*d.* that said spray gun was a two stage gun which produced air or liquid depending on how the release was depressed;

"*e.* that to spray the liquid onto the machine the way Mr. Mitchell was doing was not a careful and safe manner of operation and was contrary to his instructions;

"*f.* that when said fire started said Frank Leslie Mitchell tossed said gun down onto the floor and did not lay it down and that as a result thereof the hose attached to the gun came loose from the spray gun and die cast liquid sprayed out under pressure;

"*g.* that said die cast liquid sprayed out and spread the fire over a large area of the plant to die cast machines five and seven and from the floor to the ceiling."

The Request for Admissions was partly framed from a transcript of the record in *Arnold v. Western Casualty & Surety Co.,* 209 Kan. 80, 495 P. 2d 1007, involving the same fire. The defendant failed within the period designated by the plaintiff to file a sworn statement or written objections to the requests; thus, the admissions became binding. The defendant also made oral statements before the court admitting the truth of the statements expressed in the requests.

The record discloses that the plaintiff, after the admissions were made, sought summary judgment. Plaintiff claimed the status of its property on defendant's premises was that of a business invitee and the court should so rule as a matter of law. Plaintiff also claimed defendant was negligent as a matter of law and that plaintiff was free from contributory negligence as a matter law. After

denial of plaintiffs' motion, the plaintiff sought a partial summary judgment, again on the basis of admissions, eliminating the issue of contributory negligence. This motion was also denied. At the close of all the evidence plaintiff moved for a directed verdict, pointing out that each issue in the case could be and should be determined as a question of law rather than as a question of fact.

On appeal plaintiff presents several specifications of error. We will consider only those specifications we deem determinative of the issues in this controversy.

We refer first to specification of error No. 2, which reads as follows:

"2. In failing to rule as a matter of law as to the relationship of the parties and the duty of care owed by defendant to plaintiff."

Plaintiff argues that under the admitted and undisputed facts of this case a question of law was presented regarding the relationship of the parties and the duty of care required. Plaintiff argues the court should have determined as a matter of law whether the status of the plaintiff on the defendant's premises was (1) a bailment, gratuitous, or for mutual benefit, (2) a licensee, or (3) a business visitor-invitee.

C. C. John, owner of the defendant company, testified as follows:

"Our contract with the government was for the manufacture of these products, delivery FOB our plant. The government took delivery on the items at our plant. The government furnished the transportation. In other words, we provided the merchandise and the government supplied the transportation. Campbell 66 and Manley Transfer Company negotiated contracts with the government for transportation. We had nothing to do with who would haul a particular load. Normally the transportation companies would come in and drop their trailers after we called them. '. . . there were times when the trucker would come in and he would wait; but most of the time they would come in at their convenience and because they didn't want to tie up their tractors, I presume, and park the trailer and go away and leave it and come back at a later time and pick it up after it was loaded.'

"Q. Whose convenience did it serve?

"A. It served theirs, strictly theirs.

"Q. Did it serve any convenience of yours?

"A. No.

"Q. Could you tell the jury what would be the normal length of time for loading these trailers?

"A. Well, normally, they would load in the afternoon, and they would load in two or three hours, something in that neighborhood—loading it and checking it out.

"Q. Now, when they came in and left the trailer, what would they do with it? How was it left there?

"A. They would come in, back the trailer up to the loading dock, open the doors, put the front wheels down on the trailer and jack it up and pull the tractor out from under it and leave it there."

This testimony, coupled with the admissions, discloses that plaintiff's trailer was parked on its premises with defendant's permission, consent, approval, and invitation.

We defined a business invitee in *Weil v. Smith*, 205 Kan. 339, 469 P. 2d 428, as follows:

"A business invitee, or other invitee of equal status, is one who goes on another's premises at the express or implied invitation of the owner or occupant for the benefit of the invitor, or for the mutual benefit and advantage of both invitor and invitee." (Syl. ¶ 3.)

Express invitation to plaintiff is supplied by the undisputed evidence that defendant called plaintiff to furnish a trailer for loading. Implied invitation is supplied by the manner in which the business was conducted. The defendant could not fulfill its contract with the government unless truckers such as plaintiff were permitted to place their trailers in a loading position at the defendant's dock; thus, the benefit to the defendant was supplied. We are unable to glean from the record any undisputed facts bearing on the status of plaintiff when the trailer was placed at defendant's plant.

We are aware of the rule that courts should not encroach upon the province of a jury when the facts, though undisputed, are such that reasonable persons might draw differing inferences and arrive at opposite conclusions. (*Weil v. Smith*, supra.) Notwithstanding this cautionary rule, we are satisfied reasonable minds could not reach any conclusion other than plaintiff is a business invitee within the definition as above expressed.

Defendant cites *Lobenstein v. Pritchett*, 8 Kan. 213, *Graham v. Loper Electric Co.*, 192 Kan. 558, 389 P. 2d 750, and *Weil v. Smith*, supra, as being contrary to plaintiff's position. In each of these decisions there were issues of fact bearing on status of the parties. We have found no issues of fact here.

We conclude the plaintiff was a business invitee as a matter of law and the defendant is liable for plaintiff's loss if it resulted from defendant's failure to exercise reasonable and ordinary care.

Plaintiff's specification of error No. 5 reads:

"5. In failing to sustain plaintiff's motion for directed verdict at the close of plaintiff's evidence and at the close of all the evidence."

We will consider the court's ruling on the motion for directed verdict at the close of the evidence. Since we have concluded as

a matter of law that plaintiff was a business invitee, we must now determine whether the defendant was guilty of failing to exercise reasonable and ordinary care as a matter of law.

Again, we examine the admissions. It was there stated that Frank Leslie Mitchell, while acting in the scope of his employment as an agent, servant and employee of the defendant, was spraying a flammable liquid onto the pot on die casting machine number six which resulted in a fire. It was stated to spray the liquid onto the machine in this manner was not a careful and safe manner of operation and was contrary to his instructions. It was also stated that when the fire started Mitchell did not lay the gun down, but tossed it onto the floor, which caused the base attached to the gun to separate and die cast liquid sprayed out under pressure resulting in spreading the fire over a large area of the plant.

C. C. John testified:

"Q. And you have testified, Mr. John, that the operator of that machine was operating contrary to his instructions?

"A. That is correct.

"Q. And he was operating in an unsafe and careless manner?

"A. He was definitely not following instructions, and he was spraying a lot of stuff on this, more on this than he should have. I will concur with that statement.

"Q. And it ran down and started the fire?

"A. That is correct."

Robert B. Evans-Lombe, an employee of defendant, testified:

". . . The standard procedure for cleaning the platen is to blow, scratch or brush off the excess BB's. The BB's may be blown off with the gun that the operator has with forced air. That is the safe method of doing it. It isn't necessary to use the die release fluid and if you do use the fluid it creates a fire hazard to a certain extent. . . .

"The die cast operator did receive some burns. I did not talk to him very much but he appeared to have been burned. He had on a sleeveless shirt, his right arm was burned. The hair was singed and it was slightly tinted. . . ."

Wesley Frank, an employee of defendant, testified:

"I did not see the fire start. I was just walking out of my office. It started on die cast machine No. 6 that was being operated by Mr. Mitchell. He was standing on the cat walk near the machine. When I stepped out the door I saw a flash which came from the bottom of the machine. When I first saw the fire they had just about conquered the fire at that point. It flashed again and went over the floor and flowing back across the floor and back up the side of the other machine. When I walked out the door Mitchell took the spray gun

and threw it. There was some 15 to 40 pounds of pressure on top of the die release liquid in the hose running to the spray gun. The other hose attached to the gun was straight air. At the time of the first flash Mitchell threw the gun and bailed off the side of the cat walk. The gun was on the edge of the die. I couldn't tell whether the hose was connected to it or not. There was no evidence of any hose being connected to it but you couldn't see whether there was any on it.

"I saw three people trying to put out a fire with three fire extinguishers. I did not see Mitchell with a fire extinguisher. I would estimate it was three minutes from the time I saw the first flash until the fire was out of control.

"Q. In your opinion as what you saw and what you know about these machines, what caused this first flash?

"A. What caused the first flash was he got the two exchanged. You are supposed to use air to blow the BB's out of the die, and he used the die release agent along with it. Instead of squeezing just the air, he pulled the trigger all the way. It had run off down to the pot and that's where it flashed it up.

"Q. Is that contrary to good procedure?

"A. For that type of fluid it is.

"Q. Contrary to his instructions?

"A. Yes.

"Q. It got rid of the BB's quicker, is that right?

"A. It got rid of the BB's quicker.

"After the fire I saw Mitchell and he said he had got his arm burned and that it singed all the hair *off of it*. That was his right arm."

Considering the admissions of defendant, together with the quoted testimony, we are satisfied that reasonable minds could reach only one conclusion that defendant through its employee was guilty of negligence which caused the fire and the loss of plaintiff's trailer. Defendant argues the fatal fire would not have occurred if Mitchell had not thrown the gun. Defendant points out there was no admission that Mitchell was negligent in dropping the gun and whether or not this act resulted in negligence was a question of fact for the jury.

Whether or not the act of Mitchell in dropping the gun was negligent is immaterial. The act of Mitchell in dropping the gun was a natural and continuous sequence of the employee's original act of negligence. The proximate cause of the fire was the original negligent act of Mitchell. The subsequent act of Mitchell in dropping the gun was not an efficient intervening cause of the loss. Proximate cause is defined in *Shideler v. Habiger*, 172 Kan. 718, 243 P. 2d 211:

"The proximate or legal cause of an injury is that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces

the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. (Syl. ¶ 2.)

We have no difficulty in finding as a matter of law that defendant was guilty of negligence and that such negligence was the proximate cause of the fire and the loss.

One matter remains to be considered—contributory negligence. Defendant in its answer alleged the following:

"For further answer, defendant states and alleges that plaintiff's damages were proximately caused and contributed to by the negligence and want of care by plaintiff in that it left said trailer on defendant's premises with its dollies down and with no tractor so that it could be moved. That after the fire started, if said trailer could have been moved, it would not have been damaged because there was more than ample time to move the same before the fire reached the area where the trailer was parked. The defendant informed plaintiff's answering service of the fire and that the truck should be moved. That in addition, thereto, after not hearing from plaintiff, defendant requested a tractor from Manley Transfer Company, in order to move the trailer, but when said tractor arrived, the fire had already reached the area where the trailer was parked and there was to much heat in the area to move the trailer.

"For a further defense, defendant states and alleges that plaintiff by and through its agents and employees was familiar with defendant's plant and its method of operation, and how it manufactured its products. That plaintiff herein, by the exercise of reasonable care on its part could have known of the danger to which said semitrailer was exposed by leaving it on defendant's premises without any tractor or other power by which it could be moved in the event for any reason it was necessary to move it, but notwithstanding, plaintiff left said trailer on said premises without any equipment to move it, and thereby plaintiff assumed the risk of said trailer being damaged."

Even if the facts alleged were supported by the evidence, we believe plaintiff was free from contributory negligence as a matter of law. Succinctly stated, defendant claims two acts of contributory negligence: (1) removing the tractor from the trailer after placing the trailer in a loading position on defendant's premises, and (2) failing to provide a means of contacting plaintiff.

The evidence was undisputed that it was usual procedure to remove the tractors during the loading process. No reasonable argument can be made that this act in itself constitutes contributory negligence. Nothing more appears in the record. In order to construe this act as contributory negligence we feel it was incumbent on defendant to show that plaintiff had some reason to believe his trailer was in some danger of being damaged.

We see no merit in defendant's contention that plaintiff was contributorially negligent in failing to provide means of being contacted. In the absence of any evidence to alert plaintiff that he should be available for defendant's call, this argument fails.

An appellate review of plaintiff's other specifications of error is unnecessary in view of what we have said herein.

The judgment is reversed with directions to enter judgment for the plaintiff in the sum of $5,091.47, the stipulated loss herein.